PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 06-3625, 06-4508
_____

JANE DOE,
Appellant at No. 06-3625

v.

C.A.R.S PROTECTION  PLUS, INC.; FRED KOHL
_____

JANE DOE

v.

C.A.R.S PROTECTION PLUS, INC.; FRED KOHL


C.A.R.S Protection Plus, Inc.,
Appellant at No. 06-4508
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

(D.C. No. 01-cv-02352)

District Judge:  The Honorable Maurice B. Cohill, Jr.

_____

ARGUED OCTOBER 31, 2007

BEFORE: RENDELL and NYGAARD, <u>Circuit</u> <u>Judges</u>.
and McCLURE,[*] <u>District</u> <u>Judge</u>.

(Filed:  May 30, 2008)

_____

Gary M. Davis, Esq. (Argued)
428 Forbes Avenue
Suite 1700 Lawyers Building
Pittsburgh, PA 15219
        <u>Counsel for Appellant/Cross Appellee</u>

Robert J. Waine, Esq. (Argued)
C.A.R.S. Protection Plus, Inc.
4431 William Penn Highway
Murrysville, PA 15668
        <u>Counsel for Appellee/Cross Appellant</u>

---

        *Honorable James F. McClure, Jr., District Judge for the
United States District Court for the Middle District of
Pennsylvania, sitting by designation.

_____

OPINION OF THE COURT

_____

NYGAARD, <u>Circuit</u> <u>Judge</u>.

Jane Doe sued her former employer, C.A.R.S. Protection

Plus, Inc. (CARS), alleging employment discrimination based

on gender, in violation of Title VII of the Civil Rights Act, 42

U.S.C. § 2000e *et seq*. The District Court granted the

employer's motion for summary judgment, finding that Doe had

failed to establish a *prima facie* case of discrimination. We will

reverse.

I.

We exercise plenary review over the District Court's

grant of summary judgment and apply the same standard, i.e.,

whether there are any genuine issues of material fact such that

a reasonable jury could return a verdict for the plaintiff. FED. R.

CIV. P. 56(c); *Debiec v. Cabot Corp.*, 352 F.3d 117, 128 n. 3 (3d

Cir. 2003) (citation omitted). We view the facts of this case in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994).

In an employment discrimination case, the burden of persuasion on summary judgment remains unalterably with the employer as movant. The employer must persuade us that even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor. *See Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200, 201-02 (3d Cir. 1987), *cert. denied*, 484 U.S. 1019 (1988).

A.

CARS does business in several states insuring used cars. CARS hired Jane Doe as a graphic artist in June 1999. Doe's

sister-in-law, Leona Dunnett, was the CARS office manager.

Fred Kohl, Vice-President and part-owner of the company, was

Doe's supervisor.  In May of 2000, Doe learned that she was

pregnant.  When she told Kohl she was pregnant, she asked

Kohl about making up any time missed for doctor's

appointments.  Kohl told Doe they would "play it by ear."

On Monday, August 7, 2000,  Doe's doctor telephoned

her at work to inform her that problems were detected in her

recent blood test and that further tests were necessary.  An

amniocentesis test was scheduled for the next day.  Kohl was not

in the office on August 7, 2000, so Doe told Leona Dunnett and

Alivia Babich (who was Kohl's personal secretary), that she

needed to be off work on Tuesday, August 8, 2000.  Babich

notified Kohl that Doe would be absent.

The amniocentesis test was not performed on the 8th, but

a sonogram was, and additional tests were scheduled for the

following day.  Doe's husband telephoned Kohl and informed him that there were problems with the pregnancy and that the test would be performed on August 9th.  Kohl approved the absence and said to contact him the next day.

On Wednesday, August 9th, Doe learned that her baby had severe deformities and her physician recommended that her pregnancy be terminated.  That afternoon, Doe's husband again telephoned Kohl and told him that Doe would not be at work the next day.  Kohl approved the absence and asked that Doe's husband call him the following day.

Doe had an additional doctor's appointment on Thursday, August 10th.  Doe's husband testified that he called CARS again on that Thursday, and first spoke to Leona Dunnett.  Then, he spoke with Kohl and told him that the pregnancy would be terminated the following day.  Doe's husband requested that she be permitted to take one week of vacation the following week.

According to Doe's husband's testimony, Kohl approved the request for a one-week vacation. Her pregnancy was terminated on Friday, August 11, 2000. Neither Doe nor her husband called Kohl over the weekend of August 12th.

A funeral was arranged for Doe's baby on Wednesday, August 16th. Kohl gave Leona Dunnett (the baby's aunt) permission to take one hour off work to attend the funeral. As she was leaving for the funeral, Leona noticed Babich packing up Doe's personal belongings from her desk. After the funeral, Leona told Doe what she had seen. Doe called Kohl who told her that she had been discharged.

After Doe was discharged from her employment at CARS, she filed a timely charge with the EEOC and was issued a right-to-sue letter. Doe filed this lawsuit, alleging employment discrimination based on gender, a violation of Title VII, as amended by the Pregnancy Discrimination Act (PDA), 42

U.S.C. § 2000e(k).  Doe maintained that CARS terminated her employment because she underwent a surgical abortion.

We note at the outset that Doe does not assert a typical pregnancy discrimination claim.  She does not claim, for example, that she was discriminated against because she was pregnant or that she had been fired while on maternity leave.  Instead, she argues that she was discharged because she underwent a surgical abortion.  Whether the protections generally afforded pregnant women under the PDA also extend to women who have elected to terminate their pregnancies is a question of first impression in this Circuit.

## II.

### A.

The PDA makes it an "unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful

employment practice by this subchapter." 42 U.S.C. §

2000e-3(a); *see also Curay-Cramer v. Ursuline Acad. of*

*Wilmington, Delaware*, 450 F.3d 130 (3d Cir. 2006). In *Curay-*

*Cramer*, the Appellant argued that Title VII's opposition clause

protects any employee who has had an abortion, who

contemplates having an abortion, or who supports the rights of

women who do so. *Id.* at 134. Although we did not directly

address the question in that case, we pointed to a decision of the

Court of Appeals for the Sixth Circuit with approval:

> We note that the Sixth Circuit Court of Appeals
> has held that "an employer may not discriminate
> against a woman employee because 'she has
> exercised her right to have an abortion.'" *Turic v.
> Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th
> Cir.1996) (quoting H.R. REP. NO. 95-1786
> (1978) (Conf.Rep.), reprinted in 1978
> U.S.C.C.A.N. 4749, 4765-66). Extending that
> principle, the Sixth Circuit further held that an
> employer "cannot take adverse employment
> action against a female employee for merely
> thinking about what she has a right to do." *Id.*
> Likewise, the Equal Employment Opportunity

Commission (EEOC) has taken the position that it is an unlawful employment practice to fire a woman "because she is pregnant or has had an abortion." 29 C.F.R. pt. 1604, App. (1986).

*Id*. at 134 n.2.

The PDA states that

the terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 200e(k). The EEOC guidelines interpreting this

section, to which we give a high degree of deference under

*Griggs v. Duke Power*, 401 U.S. 424, 433-34 (1971), expressly

state that an abortion is covered by Title VII:

The basic principle of the [PDA] is that women affected by pregnancy and related conditions must be treated the same as other applicants and

Page -10-

> employees on the basis of their ability or inability to work. A woman is therefore protected against such practices as being fired ... merely because she is pregnant or has had an abortion.

Appendix 29 C.F.R. pt. 1604 App. (1986). Similarly, the legislative history of section 2000e(k) provides the following guidance:

> Because [the PDA] applies to all situations in which women are "affected by pregnancy, childbirth, and related medical conditions," its basic language covers women who chose to terminate their pregnancies. Thus, no employer may, for example, fire or refuse to hire a woman simply because she has exercised her right to have an abortion.

H.R. Conf. Rep. No. 95-1786 at 4 (1978) as reprinted in 95th Cong., 2d Sess. 4, 1978 U.S.C.C.A.N. 4749, 4766. Clearly, the plain language of the statute, together with the legislative history and the EEOC guidelines, support a conclusion that an employer may not discriminate against a woman employee because she

Page -11-

has exercised her right to have an abortion.  We now hold that the term "related medical conditions" includes an abortion.

## B.

We turn now to Doe's pregnancy discrimination claims.  As earlier noted, Title VII prohibits employment discrimination based on an individual's sex.  42 U.S.C. § 2000e-2(a).  The prohibition is breached "wherever an employee's pregnancy [or related medical condition] is a motivating factor for the employer's adverse employment decision." *In re: Carnegie Ctr. Assoc.*, 129 F.3d 290, 294 (3d Cir. 1997).  The PDA does not, however, require preferential treatment for pregnant employees.  Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work.  *Id.* at 297; *see also Tysinger v. Police Dept. City of Zanesville*, 463 F.3d 569, 575 (6th Cir. 2006).

Disparate treatment discrimination is proven by either using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate. Doe supports her claim with evidence from which discrimination may be inferred. We therefore use the familiar *McDonnell Douglas* burden-shifting framework to analyze her Title VII pregnancy discrimination claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this analysis, the employee must first establish a *prima facie* case. If the employee is able to present such a case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination.

The District Court recited a correct précis of a *prima facie* case of gender discrimination. It did not, however, acknowledge the "uniqueness" of pregnancy discrimination cases and instead, incorrectly treated Doe's claims as if they were an ordinary case of gender discrimination. A *prima facie* case cannot be established on a one-size-fits-all basis. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999). Indeed, we have often remarked that "'the nature of the required showing' to establish a *prima facie* case of disparate treatment by indirect evidence 'depends on the circumstances of the case.'" *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir.1994) (citing *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 n. 13 (3d Cir.), *cert. denied*, 464 U.S. 937 (1983)). *Compare Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (setting forth elements of a *prima facie* case of pregnancy discrimination) with *Peletier v. United States*, 388 F.3d 984, 987

Page -14-

(6th Cir. 2004) (setting out elements of a *prima facie* case of gender discrimination).

We have cautioned that "the elements of that *prima facie* case must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).  Moreover,  the Supreme Court has cautioned that the *prima facie* requirement for making a Title VII claim "is not onerous" and poses "a burden easily met." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)*; see also Scheidemantle v. Slippery Rock Univ., State Sys. of Higher Educ.,* 470 F.3d 535, 539 (3d Cir. 2006).  The *prima facie* phase of discrimination litigation "merely serves to raise a rebuttable presumption of discrimination by 'eliminating the most common nondiscriminatory reasons for the employers treatment' of a plaintiff." *Burdine*, 450 U.S. at 253-54.

1.

We have previously indicated that establishing a *prima facie* case of pregnancy discrimination differs from establishing a *prima facie* case of gender discrimination.  In *Geraci*, we wrote that

> were Geraci alleging that [her employer] terminated her solely because she is a woman, she could make out her *prima facie* case by merely showing that she is a member of a protected class, that she was qualified for her position and that she was discharged under conditions that give rise to an inference of unlawful discrimination.

82 F.3d at 580.  We modified the first element of a *prima facie* case of pregnancy discrimination to require that an employer have actual knowledge of an employees' pregnancy, reasoning that "pregnancy, of course, is different in that its obviousness varies, both temporally and as between different affected individuals." *Id*. at 581.  Therefore, in a case alleging pregnancy discrimination, to raise an inference of any unlawful discharge

a plaintiff must adduce evidence that she was pregnant, and, that the employer knew it. Id. at 580-81; *accord Prebilich-Holland v. Gaylord Entm't. Co.*, 297 F.3d 438, 444 (6th Cir. 2002). Because we did not need to address the remaining elements of the *prima facie* case of pregnancy discrimination in *Geraci,* we must do so here.

The next two elements of the *prima facie* case remain the same as those of gender discrimination. The plaintiff must be qualified for her job and she must have suffered an adverse employment decision. The fourth element requires that a plaintiff show some nexus between her pregnancy and the adverse employment action. The nexus between a plaintiff's pregnancy and an adverse employment action raises an inference of discrimination.

2.

Neither party disputes that Doe has met her burden on the first three elements of a *prima facie* pregnancy discrimination case: 1) she is or was pregnant and that her employer knew she was pregnant; 2) she was qualified for her job; and, 3) she suffered an adverse employment decision. It is the fourth element that is in dispute, namely whether there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination.

The evidence most often used to establish this nexus is that of disparate treatment, whereby a plaintiff shows that she was treated less favorably than similarly situated employees who are not in plaintiff's protected class. *See Iadimarco v. Runyon*, 190 F.3d 151, 162 (3d Cir. 1999); *see also In re Carnegie Center Associates*, 129 F.3d at 297. Although we have held that "the PDA does not require that employers treat pregnant employees better than other temporarily disabled employees" *In*

Page -18-

*re Carnegie Center,* 129 F.3d at 295, the PDA does require that employers treat pregnant employees no worse. Comparing Doe to other non-pregnant workers who were temporarily disabled, we conclude that Doe has provided sufficient evidence to satisfy the fourth element of the *prima facie* case and has thus raised an inference of discrimination sufficient to defeat summary judgment.

3.

Our factual analysis starts with CARS' somewhat less than compassionate leave policies. A memorandum authored by Kohl reveals that CARS employees were given no personal or sick leave. After one year on the job, employees were given five days' paid vacation. After five years' employment, they were given ten days. Any time taken off during a work day was to be deducted from the employee's vacation time or be unpaid.

Kohl testified that when an employee is so ill that he or she cannot work, CARS required the employee or spouse to call him or another designated supervisor on a daily basis. Employees could also arrange in advance if they knew that their illness or condition would entail missing more than one day's work. Kohl also acknowledged that there are circumstances where it is not necessary to call each day, particularly in situations where it is clear from the nature of the illness or injury that the employee cannot work. This statement contradicted Kohl's statements to the EEOC wherein he testified to the EEOC investigator that employees "needed to call off every day."

The record shows that different CARS employees were treated differently. Mike King, for example, suffered a heart attack while he was employed by CARS and testified that, although he or his wife did call to tell Kohl he was still in the

hospital, they did not do so daily, and that he was paid during his absence.  King missed two and a half days of work due to his heart attack.  Babich also testified that King's wife called in once to tell the office how he was doing, but that no one called every day.

Another employee, Bruce Boynton, left work in the middle of the day and admitted himself into a psychiatric hospital.  Kohl called Boynton while he was in the hospital and told him to report back to work or be fired.  On another occasion, Boynton went to the emergency room after work.  He called Kohl the next morning and called at least once more during the three days he missed for a hernia and back problem.

The testimony of Alivia Babich, Kohl's secretary, confirms this disparate treatment.  Babich testified that for every employee, CARS had a "separate set of rules" and that there was no uniformly enforced rule concerning the use of vacation  or

sick time. She specifically indicated that there was no rule at CARS which required an employee who was sick to call the company every day to report that they would miss work due to illness. Babich also testified that when CARS employee Michael King suffered a heart attack, neither King nor his wife called-in every day. Further, Babich testified that at least two other employees who missed work due to illness were not required to telephone the company every day. See Appendix at 215-216. This testimony indicates that although other employees were not expected to call the office every day, Doe's employment was terminated for precisely this reason. This testimony alone satisfies Doe's burden of establishing that other employees who were similarly situated were treated differently than her. But, there is more.

The District Court dismissed this discrepancy because none of these employees reported to Kohl — they had other

supervisors. Whether these other employees had other supervisors is irrelevant – based on Kohl's own testimony in which he indicates that he and he alone could give employees permission to be off sick. In his deposition, he testified:

| | |
|---|---|
| Q: | . . . was there a policy [regarding sick leave and calling-in]? |
| A: | Yes, you had to call in to make somebody aware that you weren't coming in or when you planned on coming back. |
| Q: | Who did you need to call? |
| A: | Myself. |
| Q: | Was it acceptable to call anybody else? |
| A: | If I wasn't there, Mr. Tedesco would have been. |
| Q: | Would it have been acceptable to call Alivia Babich? |
| A: | No. |
| Q: | Would it have been acceptable to call Leona Dunnett? |
| A: | No. |
| Q: | Did you have to call in yourself? If you, if you were unable or sick, could you have a spouse call? |
| A: | Absolutely. |

Appendix at 103-104.    According to this testimony, all employees had to receive permission from Kohl to be off sick and that the discretion was his alone to grant or deny permission to miss work when an employee was sick.  It is irrelevant that the other employees in question (King, etc.) had other supervisors.  Babich did report directly to Kohl and did not call every day or give a precise return date when she was out. The District Court found that Doe could not point to any evidence from which a reasonable jury could find similarly situated CARS employees were treated differently regarding calling off work because they were sick.  That finding is not supported. Babich's testimony as well as Kohl's own testimony establishes that the treatment given other employees differed from that given to Doe.  This raises an inference of discrimination sufficient to satisfy her minimal burden of establishing a *prima facie* case.

Page -24-

The District Court also indicated that these employees had all made arrangements before missing work. There is evidence, however, that Doe did exactly that. Her husband testified that he called Kohl to request a week of vacation for his wife to recover from her surgical procedure and that Kohl agreed to the request. Doe's husband testified that all of the phone calls to Kohl were made from his father's house. Doe's husband further testified that he talked to Kohl on Thursday, August 10th and got Kohl's permission for his wife to take a vacation the following week. The District Court discounted this testimony because telephone records do not show a phone call from Doe's father-in-law's number to CARS telephone number. Doe's husband's testimony on this point, however, at least raises an issue of material fact. Doe testified that the call from her father-in-law's house may have originated from a cell phone as "there was a lot going on at that time." Appendix at 51-52.

Additionally, Doe points to testimony of Leona Dunnett to re-enforce the point.  Leona Dunnett testified that on August 10th, Kohl asked her about coverage of the reception desk for the following week:

> Q:    What was the substance of the conversation [with Kohl]?
>
> A:    About coverage for the reception desk for the following week.  He asked me if I had everything covered.
>
> Q:    Did [Doe] regularly cover the reception desk?
>
> A:    Yes.
>
> Q:    All day long?
>
> A:    No.  Just for the lunch hour.
>
> Q:    What was said?
>
> A:    There was specific personnel that he did not want answering the phones, so I needed to rearrange lunch schedules so that it was covered without having those persons answering the phones for the following week.
>
> Q:    Did [Kohl] say that [Doe] would not be in work for the next week?
>
> A:    He said we needed to arrange coverage for the next week.

Page -26-

Appendix at 179.  Doe points to this as confirmation that the August 10th phone call did take place – Kohl wanted to make sure that the telephones were covered because he knew Doe would be off the following week.

The District Court further found that Doe had not met this fourth element of the *prima facie* case because the record shows no discriminatory animus toward her for having an abortion.  Doe counters with the following testimony of Leona Dunnett:

Q:      What was the situation surrounding your leaving CARS?

A:      On a daily basis, I go into Mr. Kohl's office to check the warranties, and I was there as he and Alivia were working on whatever, I was checking through the warranties and Alivia said, "I don't know what all this secrecy behind [the plaintiff] losing her baby was."  And Mr. Kohl said "she didn't want to take responsibility."  Which upset me.

The District Court found these to be "stray remarks" and did not give them much weight. True enough, we held in *Ezold* that stray remarks by decision-makers, which were unrelated to the decision-making process, are rarely to be given weight, particularly if they are made temporally remote from the date of the decision. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992). However, we later explained that such remarks could provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive. *Antol v. Perry*, 82 F.3d 1291, 1302 (3d Cir. 2006). As the Court of Appeals for the Eighth Circuit has opined, "although ... stray remarks, standing alone, may not give rise to an inference of discrimination, such remarks are not irrelevant." *Fisher v. Pharmacia & Upjohn*, 225 F.3d 915, 922 (8th Cir. 2000).

Here, we focus on Kohl's remarks in which he indicated that Doe "did not want to take responsibility." A finder of fact could infer that Kohl was referring to Doe's abortion because before this remark, Babich was talking about her disagreement with the "secrecy" surrounding Doe's baby. It is unclear, however, what "responsibility" Kohl felt Doe should take. Kohl may have been referring to Doe's failure to take responsibility for her selection of an abortion procedure. Kohl may have been referring to Doe's failure to take responsibility for her own job termination. Kohl's commentary could also have been insinuating that Doe did something to cause the loss of her own baby. Or, Kohl could have been castigating Doe for not acknowledging the abortion because of an anti-abortion environment at CARS or Kohl's own personal beliefs about abortion. What is clear is that this particular remark may raise a reasonable inference that the abortion was a factor in

Page -29-

terminating Doe's employment.  Such comments are "surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow, thus providing additional threads of evidence that are relevant to the jury." *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 610 (8th Cir. 1997) (citations and quotations omitted)[1]

Finally, Doe argues that her discharge only three working days after having an abortion raises an inference of discrimination because the temporal proximity between her abortion and the adverse employment action is "unusually suggestive." We have held temporal proximity sufficient  to create an inference of causality to defeat summary judgment.

_____

1.      Although *Bevan* was on appeal following a jury verdict in favor of the plaintiff and the district court's denial of the defendant's motion for judgment as a matter of law, the Supreme Court in *Reeves* stated that the standard applied in reviewing a judgment as a matter of law is identical to that applied in reviewing a grant of summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n.*, 503 F.3d 217, 232-233 (3d Cir. 2007). In assessing causation, we are mindful of the procedural posture of the case. *See id.* at 279 n. 5 ("There is ... a difference between a plaintiff relying upon temporal proximity to satisfy her *prima facie* case for the purpose of summary judgment, and to reverse a verdict.") (internal citation omitted).

Here, Doe was fired on the day her baby was buried, just three working days after she notified Kohl that she would have to undergo an abortion. Because the District Court found Doe's discharge to coincide with her failure to "make further phone calls to Kohl as he had asked her to do," it reasoned that the timing was not unusually suggestive of discrimination. The temporal proximity, however, is sufficient here to meet Doe's minimal *prima facie* case burden as to the causal connection element. *See e.g. Fasold v. Justice*, 409 F.3d 178, 189-90 (3d

Cir. 2005) (discussing a period less than one month and noting that "a short period of time" may provide the evidentiary basis of an inference of retaliation)).

Summary judgment is to be used sparingly in employment discrimination cases, especially where, as here, we are viewing the case at first glance.  Mindful that the plaintiff's burden at this first stage is not particularly onerous, we conclude that Doe has established a *prima facie* case.

### C.  Pretext

The District Court held that even if Doe had established a *prima facie* case, she failed to show that the nondiscriminatory reasons for her employment discharge were pretextual.  The record refutes the holding.  Once the plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas*, 411 U.S.

at 802; *see also Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000). When the plaintiff meets this burden, the court's "factual inquiry then proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255. The presumption of discrimination established by the *prima facie* showing "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

If the defendant meets this burden, the plaintiff must then show that the legitimate reasons offered by the defendant are merely a pretext for discrimination. *See Jones*, 198 F.3d at 410. In order to show pretext, a plaintiff must submit evidence which (1) casts doubt upon the legitimate reason proffered by the employer such that a fact-finder could reasonably conclude that the reason was a fabrication; or (2) would allow the fact-finder to infer that discrimination was more likely than not a motivating or determinative cause of the employee's termination.

See *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Chauhan v. M. Alfieri Co., Inc.*, 897 F.2d 123, 128 (3d Cir. 1990). Put another way, to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext). *See Anderson*, 13 F.3d at 1124; *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir.1993).

Lastly, it is important to remember that the *prima facie* case and pretext inquiries often overlap. As our jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other. *Farrell*, 206 F.3d at 286; *see also Iadimarco*,

190 F.3d at 166 (explicitly referring to the evidence of the *prima facie* case in finding evidence supporting pretext); *Jalil*, 873 F.2d at 709 n. 6 ("Although this fact is important in establishing plaintiff's *prima facie* case, there is nothing preventing it from also being used to rebut the defendant's proffered explanation.").

1.

CARS maintains that it fired Doe because she abandoned her job (the week she thought she was 'on vacation' following the abortion and the funeral). Specifically, CARS asserts that Doe was fired because neither she nor her husband called to request Friday, August 11th or the week of August 14th off from work. Unexcused absence from work is a legitimate, nondiscriminatory reason for terminating employment.

Before the District Court and again before us on appeal, Kohl asserts that he never received a telephone call from Doe's husband informing him that Doe would be off work on Friday

the 11th and would need vacation time for the week of the 14th. As we noted earlier, that fact is subject to dispute from contradictory evidence. Doe pointed to her husband's testimony to the contrary. The District Court discounted Doe's husband's testimony, finding it "belied by the telephone records of calls from [Doe's husband's] father's telephone number." Dist. Ct. Op. at 12. Here, the District Court inappropriately narrowed Doe's husband's testimony, who indicated that he may have called from a borrowed cell phone. Appendix at 86-87. This testimony is also backed-up by Doe's own testimony that the call "had to be from a cell phone" and that " there was a lot going on at that time." Appendix at 51-52.

Additionally, the testimony of Leona Dunnett could be viewed by a fact-finder as substantiating Doe's claim that the call was made and that she received a week of vacation from Kohl. Leona Dunnett testified that Doe's husband called her on

Friday, August 11th and asked what he would need to do for Doe to use vacation time for the week of August 14th. Dunnett also testified that she explained to Doe's husband that he would need to request it from Kohl, and that she then transferred the call to Kohl. She further testified that, after that call, Kohl asked her to make sure she had the receptionist station covered by other employees during the lunch hour for the week in question (a task for which Doe was usually responsible). Kohl's awareness of a receptionist-coverage issue permits an inference that he knew Doe would be on vacation that week.

The District Court held that Doe produced no evidence from which a reasonable jury could disbelieve CARS' asserted reason for firing her and concluded, instead, that she was discharged for discriminatory reasons. The record refutes this conclusion. This testimony creates a genuine issue of material

fact as to whether CARS' proffered reasons for terminating Doe's employment were a pretext.

Finally, the District Court did not believe that Doe had pointed to any evidence which cast doubt on whether Kohl had a good faith belief that Doe had abandoned her job. The conversation between Kohl and Babich, in which Kohl remarked that Doe had not taken responsibility for her abortion indicates that Kohl may have had other reasons for terminating Doe's employment than her "abandonment" of her job. These are questions for a jury – not ones that should be resolved on summary judgment. Doe produced testimony which creates genuine issues of material fact, the resolution of which may lead a jury to determine that CARS' asserted reasons for discharging her are pretext.

III.

CARS has filed a cross appeal alleging that the District Court improperly sealed the case. "[O]rders releasing sealed material and denying a motion to unseal are collateral orders within the meaning of 28 U.S.C. § 1291," *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 n. 4 (3d Cir. 1991), and we review the grant or modification of a confidentiality order for an abuse of discretion. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 783 (3d Cir. 1994). There was no abuse of discretion. The record fully supports the District Court's order.[2]

---

2.    CARS also challenges Does' use of a pseudonym. We acknowledge that the use of pseudonyms to conceal a plaintiff's identity has no explicit sanction in the federal rules. Nonetheless, the Supreme Court has given the practice implicit recognition in two abortion cases, *Roe v. Wade*, 410 U.S. 113 (1973), and *Doe v. Bolton*, 410 U.S. 179 (1973). Although we have yet to address the issue, the decision whether to allow a

(continued...)

IV. Conclusion

Doe has established a *prima facie* case. Furthermore, she has pointed to sufficient evidence from which a fact-finder could infer that the CARS' non-discriminatory reason for firing Doe was a pretext. The District Court's order will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

---

2.    (...continued)
plaintiff to proceed anonymously rests within the sound discretion of the court. *See Doe v. Frank*, 951 F.2d 320, 323 (11th Cir. 1992); *Lindsey v. Dayton-Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir.), *cert. denied*, 444 U.S. 856 (1979). After a careful review of all the circumstances of this case (including the District Court's thorough hearing), we cannot say the trial court abused its discretion in granting Doe's motion to proceed anonymously.